**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **LAURA JOHNSON** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | |
| | § | **CIVIL ACTION NO. ___________** |
| **THE LINCOLN NATIONAL INSURANCE COMPANY** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Laura Johnson files this Original Complaint against The Lincoln National Insurance Company.

**NATURE OF THE CASE**

1. This is an employment benefits case brought under Section 502 of the Employee Retirement Income Security Act ("ERISA") against The Lincoln National Insurance Company ("Lincoln") in its capacity as the administrator of the Vacations Publications, Inc. Group Life Insurance, and Accidental Death & Dismemberment Insurance Plan. Johnson brings this action to secure all benefits, however they be described to which she is entitled under an insurance policy underwritten and administered by Lincoln. Johnson is the named beneficiary of said policy insuring her son James Babaria, who was employed with Vacations Publications, Inc. at the time of his death.

2. Johnson files this lawsuit because Lincoln wrongly denied her Accidental Death benefits, related to the death of her son in an automobile collision, based upon a policy exclusion that was unsupported by the evidence before it. Specifically, Lincoln denied benefits based upon an exclusion for death caused by the ingestion of drugs without a prescription. Lincoln based its

decision upon a preliminary drug test that by its own standards was not definitive. Lincoln further entirely ignored all other evidence including definitive medical literature demonstrating that the testing at issue was not reliable, as well as physical evidence demonstrating the vehicular accident that resulted in her son's death was caused by poor driving conditions.

## PARTIES

3. Johnson is a citizen and resident of Miami, Oklahoma.

4. Lincoln is a properly organized business entity doing business in the State of Texas. Lincoln may be served with process by serving its registered agent: Corporation Service Company, 211 East 7th Street, Suite 260, Austin, TX 78701-3218.

5. The Life Insurance and Accidental Death and Dismemberment Plan at issue in the case is both funded and administered by Lincoln.

## JURISDICTION AND VENUE

6. This court has jurisdiction to hear this claim pursuant to 28 U.S.C. § 1331 as the claim arises under the laws of the United States of America. Specifically, Johnson brings this action to enforce her rights under Section 502(a)(1)(B) of ERISA, which provides "[a] civil action may be brought . . . (1) by a participant or by a beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

7. Venue is proper in the Southern District of Texas as Lincoln does business in the district. Under the ERISA statute, venue is proper "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). Therefore, venue may also be proper under the third prong of ERISA's venue provision, specifically "where a defendant resides or may be found." (*Id.*) "District courts within

the Fifth Circuit have adopted the reasoning outlined by the Ninth Circuit in *Varsic v. United States District Court for the Central District of California*, 607 F.2d 245 (9th Cir. 1979*). See Sanders v. State Street Bank and Trust Company*, 813 F. Supp. 529, 533 (S.D. Tex. 1993). The Ninth Circuit, in *Varsic*, concluded that whether a defendant "resides or may be found" in a jurisdiction, for ERISA venue purposes, is coextensive with whether a court possesses personal jurisdiction over the defendant. *Varsic*, 607 F.2d at 248." *See Frost v. ReliOn, Inc*., 2007 U.S. Dist. LEXIS 17646, 5-6 (N.D. Tex. 2007). Under ERISA's nationwide service of process provision, a district court may exercise personal jurisdiction over the defendant if it determines that the defendant has sufficient ties to the United States. See *Bellaire General Hospital v. Blue Cross Blue Shield of Michigan,* 97 F.3d 822, 825-26 (5th Cir. 1996), citing *Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255, 1258 (5th Cir. 1994). Here, Lincoln is "found" within the Southern District of Texas, as it does business here, and the court has personal jurisdiction over Lincoln, as it has sufficient ties to the United States.

**CONTRACTUAL AND FIDUCIARY RELATIONSHIP**

8. At all relevant times, Johnson has been a covered beneficiary under a group Life Insurance, and Accidental Death & Dismemberment Insurance Policy (the "Policy"). The Policy became effective on August 1, 2013.

9. The Policy was obtained by Johnson's son Barbaria through his employment with Vacations Publications, Inc.

10. Under the terms of the Policy, Lincoln administered the Plan and retained the sole authority to grant or deny benefits.

11. Lincoln funds the Plan benefits.

12. Because Lincoln both funds the Plan benefits and retains the sole authority to grant or deny benefits, Lincoln has an inherent conflict of interest. The court should consider this conflict as an important factor during its review in determining Lincoln's decision to deny benefits to Johnson.

## ADMINISTRATIVE APPEAL

13. On November 7, 2016, Barbaria was involved in an automobile collision on Westheimer Road in Houston, Texas when the vehicle he was driving suddenly crossed the center line and collided with an oncoming vehicle. The collision occurred at 1:05 a.m. The police report of the accident establishes that it was dark and raining and that the road was wet at the time of the accident.

14. Barbaria was seriously injured in the accident. He was taken by ambulance to Ben Taub General Hospital. During his triage in the emergency room, hospital staff performed a urinary toxicology analysis. Barbaria's urine test returned positive for amphetamines, benzodiazepines, cannabinoids, and opiates. This urinary analysis however was only preliminary, and it carried an express disclaimer that such tests were only appropriate for clinical use as opposed to a conclusive determination of intoxication. Moreover, the toxicology test, by its design, is qualitative not quantitative, meaning that it only revealed that Barbaria was exposed to these drugs, but not at what time or in what amount.

15. Barbaria was pronounced dead on November 11, 2016. The cause of death is listed on Barbaria's death certificate as multiple blunt force injuries.

16. On November 23, 2016, Johnson filed her initial claim for Voluntary Life and Accidental Death Benefits as the named beneficiary of Barbaria under the Plan.

17. On January 12, 2017, Lincoln paid Johnson voluntary life insurance benefits.

18. On January 13, 2017, Lincoln denied Johnson's claim for accidental death benefits. Lincoln based its denial of death benefits on an exclusion contained in the Policy which states that "[b]enefits are not payable for any loss to which a contributing case is: (7) [v]oluntary use of drugs except when prescribed by a physician.". Lincoln cited Barbaria's toxicology report as the sole evidence that such an exclusion applied.

19. On March 9, 2017, Johnson filed a written request for a claims review with Lincoln. In the request, Johnson asserted that there was no evidence that voluntary use of drugs contributed to Barbaria's collision, and that the toxicology report, although positive, was not evidence that Barbaria was impaired at the time of the collision or that Barbaria had ingested drugs at a time before the collision that would have established his intoxication. Johnson also provided, among other things, Lincoln a copy of the toxicology report itself, which carries the express disclaimer that "Urine Toxicology Screen results are to be used only for Medical purposes." Johnson further provided Lincoln with the police report for the crash which identified the only contributing cause or condition of the accident was Barbaria's failure to drive in a single lane.

20. On July 21, 2017, Lincoln denied Johnson's initial appeal of her claim. Lincoln again based its decision to deny benefits on the exclusion in the Policy related to the voluntary use of drugs. Lincoln's only evidence that such an exclusion applied was the results of Barbaria's toxicology report. In its review, Lincoln did not address the express disclaimer of the toxicology report that it should not be used for such purposes. It did not address how nor when the drugs would have been ingested by Barbaria. Neither did Lincoln address the driving conditions pointed out in the police report.

21. On September 14, 2017, Johnson filed a written request for a Second Level Appeal with Lincoln.

22. On or about November 22, 2017, as a part of the Second Level Appeal, Johnson submitted the affidavit of Dr. Jimmie Valentine, an experienced toxicologist as well as two articles that Dr. Valentine believed instructive on the subject of toxicology. In his report, Dr. Valentine established that the specific toxicology test, an immunoassay test, was only appropriate in a clinical setting as a quick reference for treating physicians. Referencing one of the articles submitted, Dr. Valentine established that such tests have significant false positive results, and thus should never be used as a definitive diagnosis for the influence of drugs. Instead, Valentine posited that such a definitive diagnosis could only come from testing using a chromatographic method. Dr. Valentine further opined that Barbaria's positive results for four different types of drugs was very unusual and likely caused due to therapeutic drugs used by physicians trying to save his life.

23. On or about November 30, 2017, Lincoln employed Dr. Mark Myck, a licensed toxicologist, to conduct a peer-review of Dr. Valentine's work. Dr. Mycyk did not even attempt to rebut Dr. Valentine's opinion that the immunoassay test used on Barbaria's urine was unsound for a diagnosis of drug intoxication. Dr. Mycyk did not address the likelihood of false positives in such tests as identified by Dr. Valentine. Dr. Mycyk did not address whether such a report should be used outside a medical setting as was expressly set forth in the disclaimer contained in the report itself.

24. More glaringly, Dr. Mycyk admitted in his report that he could not tell when, what kind, or how much of any intoxicant Barabaria may have ingested. Dr. Mycyk admitted that the immunoassay test was "qualitative" and not "quantitative". Further, Dr. Mycyk stated that "[b]ecause these were qualitative tests, the exact identification of what those products were (e.g., was the positive opiate result morphine or heroin or methadone or another prescription opioid) or exactly when consumed cannot be determined." As a result, nowhere in Dr. Mycyk's report did

he ever establish that the data from the toxicology report were in any way evidence that Barbaria was under the influence of drugs at the time of his accident. Indeed, the only conclusion that Dr. Mycyk actually drew from the report was that Barbaria was exposed to drugs at some unknown time prior to his accident. Whether that was hours, days, or weeks, Dr. Mycyk could not say.

25. Nonetheless, Dr. Mycyk built inference upon inference in an attempt to make a positive finding for Lincoln's benefit. Dr. Mycyk assumed, without establishing with any evidence that Barbaria voluntarily ingested the drugs that showed upon in the toxicology report. Dr. Mycyk then opined that because the drugs found in the toxicology report ***could*** cause symptoms that ***could*** cause erratic driving, and because Barabaria drove erratically, that Barbaria ***must*** have been under the influence of drugs at the time of the accident. As with Lincoln's approach to Johnson's case in general, Dr. Mycyk ignored entirely the driving conditions that could also have resulted in erratic driving absent intoxication before leaping to the conclusion that Barbaria was under the influence of drugs at the time of the accident.

26. On January 8, 2018, Lincoln denied Johnson's Second Level Appeal. Lincoln entirely discounted the opinion of Dr. Valentine even though Dr. Mycyk entirely failed to address Valentine's opinion that the immunoassay test is not reliable evidence of drug use or intoxication. Lincoln did not address or even recognize the limitations of the test that Dr. Mycyk admitted existed in his report. Lincoln then assumed without evidence that any drugs in Babaria's system were taken voluntarily instead of accidentally or through some other method. And again, Lincoln did not even consider that other causes known to exist, such as bad weather, poor visibility, and wet road conditions could easily have been responsible for the accident without Barbaria being under the influence of drugs.

27. Johnson has now exhausted her administrative remedies, and her claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

**LINCOLN'S CONFLICT OF INTEREST**

28. At all relevant times, Defendant has been operating under an inherent and structural conflict of interest as Lincoln not only administers Johnson's claims under the Plan, but it is also liable for benefit payments due to Johnson and each payment depletes Lincoln's assets.

29. Lincoln's determination was influenced by its conflict of interest.

30. On information and belief, Lincoln has failed to take active steps to reduce potential bias and to promote accuracy of its benefits determinations.

**COUNT I:**
**WRONGFUL DENIAL OF BENEFITS UNDER ERISA, 29 U.S.C. § 1132**

31. Johnson incorporates those allegations contained in paragraphs 1-30 as fully set forth at length herein.

32. Lincoln wrongfully denied death benefits to Johnson in violation of the Plan provisions and ERISA as Johnson's son Barbaria was not under the influence of drugs at the time of the automobile accident that killed. Indeed, the reliable evidence available to Lincoln established that the car accident that caused Barbaria's death was caused by poor weather, bad lighting, and wet road conditions. Accordingly, the Lincoln violated its contractual obligation to furnish accidental death benefits to Johnson.

**COUNT II: ATTORNEY FEES AND COSTS**

33. Johnson incorporates those allegations contained in paragraphs 1-32 as fully set forth at length herein.

34. By reason of Lincoln's failure to pay Johnson benefits as due under the terms of the Plan, Johnson has been forced to retain attorneys to recover such benefits, for which Johnson

has and will continue to incur attorney's fees. Johnson is entitled to recover reasonable attorney's fees and costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1).

## CONCLUSION

35. Based on the foregoing, Johnson requests that the court:

A. Issue summons commanding Lincoln to appear and answer this Original Complaint;

B. Grant Johnson declaratory relief, finding that she is entitled to all accidental death benefits provided in the Policy;

C. Order Lincoln to pay her all accidental death benefits provided under the Policy;

D. Order Lincoln to pay for the costs of this action and Johnson's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g); and

E. For such other relief as may be deemed just and proper by the Court.

Respectfully submitted,

By: */s/ M. Kevin Powers*

M. Kevin Powers--*Attorney in Charge*
State Bar No. 24041715
1776 Yorktown, Suite 300
Houston, TX 77056
(713) 621-0700 (tel)
(713) 621-0709 (fax)
kevin@porterpowers.com

**OF COUNSEL:**

**PORTER & POWERS, PLLC**
1776 Yorktown, Suite 300
Houston, TX 77056
(713) 621-0700 (tel)
(713) 621-0709 (fax)

**ATTORNEYS FOR LAURA JOHNSON**